UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MOHAWK SPRING DIVISION OF MW INDUSTRIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> ZD INTEGRATED CIRCUITS, INC., <br><br> Defendant. | Case No. 17-cv-9227 <br><br> Judge John Robert Blakey |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Mohawk Spring Division of MW Industries, Inc., a manufacturer of springs and wires, sued ZD Integrated Circuits, Inc. (ZDI), a seller and distributer, for failing to make payments under a supply agreement (the Supply Agreement). [25]. Plaintiff brings a two-count complaint: Count I alleges that Defendant breached the Supply Agreement; Count II alleges, in the alternative, that Defendant was unjustly enriched by selling Plaintiff's products without paying Plaintiff for them. *Id.* The parties have cross-moved for summary judgment on Plaintiff's claims. For the reasons explained below, this Court grants Plaintiff's motion [32] and denies Defendant's motion [30].

**I. Background**

The facts in this section come from Defendant's statement of undisputed facts [31] and Plaintiff's statement of undisputed facts [33].

As a preliminary matter, this Court has broad discretion to enforce the local rules governing summary judgment. *See, e.g.*, *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014); *Benuzzi v. Bd. of Educ. of Chi.*, 647 F.3d 652, 655 (7th Cir. 2011). Under the local rules, a party's responses to the other party's statements of fact must contain "specific references" to record evidence to justify any denial. Local R. 56.1(b)(3); *see also Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000). Failure to respond to a statement results in the district court admitting the uncontroverted statement as true. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006).

Here, Defendant has failed to respond to paragraphs 1–6, 8–10, 12–22, 24–31, 34, and 38–52 of Plaintiff's statement of facts. *Compare* [33] *with* [35]. Thus, this Court deems those facts admitted.

### A. The Parties

Defendant is a Florida corporation that brokers technical parts and components and provides supply chain services to manufacturers. [31] ¶ 1. Craig Zurman identifies himself as Defendant's sole director and officer. *Id.* ¶ 4. Plaintiff manufactures and sells various types of springs and wire forms. *Id.* ¶ 2.

In May 2016, Plaintiff's customer—Engineer Controls International, LLC (ECI)—announced a new supply chain initiative and engaged Defendant to act as a middle-man between it and Plaintiff. [33] ¶ 8. Pursuant to that initiative, ECI required that Defendant source products from Plaintiff for ultimate sale to ECI. *Id.*

### B. Trexler

ECI introduced Plaintiff to Defendant's representative Eddie Trexler. *Id.* ¶ 11. Although Trexler was Defendant's General Sales Manager, Plaintiff initially

2

understood Trexler to be Defendant's President. *Id.* ¶¶ 11, 19. In July 2016, Plaintiff began working with Trexler to fulfill ECI's orders. *Id.* ¶ 10.

Throughout the parties' relationship, Trexler made all decisions and issued all directives on behalf of Defendant. *Id.* ¶ 13. Plaintiff's only other contacts with Defendant were Defendant's warehouse staff and Claudia Walker, Trexler's assistant. *Id.* ¶ 14. Plaintiff never met, spoke with, or was even aware of Craig Zurman. *Id.*

And, although Trexler spoke periodically with Zurman, Zurman allowed Trexler to manage his accounts, including—primarily—Defendant's relationships with Plaintiff and ECI. *Id.* ¶ 23. Trexler did not submit sales, orders, or payments to Zurman for approval; rather, Trexler made payments and issued wire transfers on his own. *Id.* ¶ 24. Trexler also managed and directed all aspects of product purchases and sales between Plaintiff and ECI, including pricing, shipping, delivery, managing the inspection of products, negotiating product specifications between ECI and Plaintiff, and managing purchase orders and invoices. *Id.* ¶ 27.

Moreover, Zurman admitted that he never had any contact with Plaintiff; instead, he "entrusted" the relationship with Plaintiff to Trexler. *Id.* ¶ 34; [33-5] at 19. And, from Plaintiff's perspective and course of dealing, Trexler remained in charge of Defendant's relationship with Plaintiff. [33-1] at 3.

**C.    Defendant Falls Behind On Payments To Plaintiff**

In August 2017, Plaintiff contacted Trexler because Defendant was significantly past due on payments it owed to Plaintiff. [33] ¶ 29; [33-1] at 3. At that time, Defendant owed Plaintiff approximately $1.1 million, and it was 60 days

3

overdue. [33] ¶ 29. Plaintiff requested immediate payment and informed Trexler that it intended to withhold future shipments until Defendant paid the past due balance. *Id.* ¶ 30.

Trexler then called Zurman, informing him that Defendant was in arrears and that Plaintiff would not ship additional products unless Defendant began payment. [31] ¶ 12. Zurman instructed Trexler to discuss a repayment plan with Plaintiff, *id.* ¶ 13, and agreed to Trexler's suggestion to pay Plaintiff $200,000 to put an end to Plaintiff's shipping hold, [33-5] at 21. Zurman never spoke with Plaintiff directly about Defendant's arrearage; rather, he "entrusted" the parties' relationship to Trexler and, to that end, told Trexler to "fix it." *Id.*

Plaintiff and Trexler then negotiated payment schedules to address the past due balance; eventually, the parties agreed to a payment schedule, and Defendant resumed payments. [33] ¶ 31.

### C. The Parties Execute The Supply Agreement

The parties next entered into the Supply Agreement, which finalized Defendant's payment terms and set forth the terms and conditions for future sales. *Id.* ¶ 35; [33-4]. The Supply Agreement had an August 25, 2017 effective date, and the parties' representatives signed it on September 7, 2017. *Id.* Zurman testified that he had no knowledge of the Supply Agreement until this lawsuit and that he fired Trexler upon learning of both. [31] ¶¶ 15, 17.

The relevant provisions of the Supply Agreement are as follows.

Section 3.04(a) of the Supply Agreement provides:

> Buyer acknowledges and agrees that, as of the Effective Date, Buyer is past due on payments to Supplier in an aggregate amount of $1,064,000 (the "Past Due Amount"). The Parties acknowledge and agree that the Past Due Amount, along with the invoice amounts reflected on Exhibit B attached hereto (collectively, such aggregate invoice amounts together with the Past Due Amount, the "Paydown Amount"), shall be due and payable in accordance with the payment schedule set forth on Exhibit B.

[33-4] at 5.

In addition, Section 3.04(d) entitles Plaintiff to interest, costs, and attorney's fees for any late payments:

> Buyer shall make all payments hereunder by wire transfer or check and in US dollars. Buyer shall pay interest on all late payments at the lesser of the rate of 1.5% per month or the highest rate permissible under applicable law, calculated daily and compounded monthly. Buyer shall reimburse Supplier for all costs incurred in collecting any late payments, including, without limitation, attorneys' fees. In addition to all other remedies available under this Agreement or at law (which Supplier does not waive by the exercise of any rights hereunder), Supplier shall be entitled to suspend the delivery of any Products if Buyer fails to pay any amounts due and payable by reason of any set-off of any claim or dispute with Supplier, whether relating to Supplier's breach, bankruptcy or otherwise.

*Id.*

Section 4.02 of the Supply Agreement provides termination rights:

> In addition to any remedies that may be provided under this Agreement or applicable law, Supplier may terminate this Agreement and/or any or all Purchase Orders, in whole or in part, with immediate effect upon written notice to Buyer, if Buyer:
> (a) fails to pay any amount when due under this Agreement;
> (b) has not otherwise performed or complied with this Agreement, in whole or in part;
> (c) fails to provide Supplier, within a commercially reasonable time after Supplier's request (but in no case exceeding five (5) days after such request), with adequate and reasonable assurance of Buyer's financial capability to perform timely all of Buyer's obligations under this Agreement; or

> (d) becomes insolvent, files a petition for bankruptcy or commences or has commenced against it proceedings relating to bankruptcy, receivership, reorganization or assignment for the benefit of creditors.

*Id.* at 5–6.

Finally, Exhibit B of the Supply Agreement sets forth a payment schedule, pursuant to which Defendant agreed to make weekly payments to Plaintiff from August 25, 2017 through December 15, 2017. *Id.* at 18.

While Plaintiff performed under the Supply Agreement by sending product shipments, [33] ¶ 44, Defendant made only two weekly payments, *id.* ¶ 42. In November 2017, Plaintiff's representatives visited Defendant's office to discuss and potentially resolve the past due balance owed; the parties, however, did not reach resolution at that time. *Id.* ¶ 45. A few weeks later, Plaintiff accepted the return of $250,000 worth of inventory Plaintiff previously sold to Defendant to reduce Defendant's obligation. *Id.* ¶ 46.

On December 6, 2017, Plaintiff sent Defendant a termination letter pursuant to Section 4.02 of the Supply Agreement, therein terminating the Supply Agreement. *Id.* ¶ 48. Defendant owes $960,284.04 under the Supply Agreement. *Id.* ¶ 50.

## II.    Legal Standard

Summary judgment is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the non-moving party. *See CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 (7th Cir. 2014). The non-moving party has the burden of identifying the evidence creating an issue of fact. *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). To satisfy that burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Thus, a mere "scintilla of evidence" supporting the non-movant's position does not suffice; "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252.

Cross-motions for summary judgment "do not waive the right to trial;" rather, this Court "treats the motions separately in determining whether judgment should be entered in accordance with Rule 56." *Marcatante v. City of Chicago, Ill.*, 657 F.3d 433, 438–39 (7th Cir. 2011).

### III. Analysis

The parties cross-move for summary judgment on Plaintiff's breach of contract and unjust enrichment claims. [30] [32].

#### A. Count I: Breach of Contract

##### 1. Governing Law

Before turning to the merits of the parties' arguments, this Court first determines what substantive law applies to Plaintiff's breach of contract claim.

7

Federal courts sitting in diversity apply the choice-of-law rules of the state in which they sit. *Dobbs v. DePuy Orthopedics, Inc.*, 842 F.3d 1045, 1048 (7th Cir. 2016). Illinois "respects a contract's choice-of-law clause as long as the contract is valid and the law chosen is not contrary to Illinois's fundamental public policy." *Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 705 (7th Cir. 2004).

The parties do not dispute that the Supply Agreement contains an Illinois choice-of-law clause, which provides:

> All matters arising out of or relating to this Agreement are governed by and construed in accordance with the internal laws of the State of Illinois without giving effect to any choice or conflict of law provision or rule . . . that would cause the application of the laws of any jurisdiction other than those of such State.

[33-4] at 8. Relying upon this clause, Plaintiff argues that Illinois law applies to the parties' dispute. [37] at 4–5.

Defendant, on the other hand, argues that the Supply Agreement is invalid, rendering the choice-of-law clause inapplicable. [30] at 3–5. Defendant urges instead that Florida law applies because it is incorporated there. [40] at 2–3.

This Court, however, need not decide this issue, because Defendant fails to identify any conflict between the two states' relevant laws. To the contrary, Defendant expressly asserts that there "is no material difference between Florida and Illinois law." *See id.* at 2. Where the parties have not identified a conflict of law affecting the issues in a case, a district court sitting in diversity applies the substantive laws of the forum state—here, Illinois. *See Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 729 (7th Cir. 2014) (instructing that a "choice-of-law

8

determination is required only when the [party seeking a choice-of-law determination] has established an actual conflict between state laws.") (quoting *Bridgeview Health Care Ctr., Ltd. v. State Farm Fire & Cas. Co.*, 10 N.E.3d 902, 905 (Ill. 2014)); *Gould v. Artisoft, Inc.*, 1 F.3d 544, 549 n.7 (7th Cir. 1993) ("Where the parties have not identified a conflict between the two bodies of state law that might apply to their dispute, we will apply the law of the forum state—here, Illinois."). This Court thus applies Illinois law to the parties' contract dispute.

### 2. Agency Principles

Plaintiff alleges that Defendant breached the Supply Agreement by failing to make payments, as set forth in Section 3.04 and Exhibit B. [25] ¶¶ 28–33. The parties' sole dispute is whether Plaintiff can prove the existence of a valid and enforceable contract, as it must under Illinois law. *See Spitz*, 759 F.3d at 730 (to prevail on a breach of contract claim under Illinois law, the plaintiff must establish, among other things, "the existence of a valid and enforceable contract") (quoting *Lindy Lu LLC v. Ill. Cent. R.R. Co.,* 984 N.E.2d 1171, 1175 (Ill. App. Ct. 2013)). As noted above, Defendant argues that the Supply Agreement is invalid, contending that Trexler did not have authority to bind Defendant to it. [30] at 3–5.

Under Illinois law, a party executing a contract without authority renders the contract void *ab initio*. *Siena at Old Orchard Condo. Ass'n v. Siena at Old Orchard, L.L.C.,* 75 N.E.3d 420, 442 (Ill. App. Ct. 2017). To bind a principal, an agent must have either actual or apparent authority, or the principal must ratify the agent's unauthorized actions. *NECA-IBEW Rockford Local Union 364 Health & Welfare*

9

*Fund v. A & A Drug Co.*, 736 F.3d 1054, 1058–59 (7th Cir. 2013); *Anetsberger v. Metro. Life Ins. Co.*, 14 F.3d 1226, 1234 (7th Cir. 1994).

Apparent authority "arises when a 'principal creates, by its words or conduct, the reasonable impression in a third party that the agent has the authority to perform a certain act on its behalf.'" *NECA-IBEW*, 736 F.3d at 1059 (quoting *Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1065 (7th Cir. 2000)). Accordingly, when a "principal has created the appearance that someone is his or her agent, and an innocent third party has reasonably relied on the apparent agency and been harmed as a result, the apparent principal should not be permitted to deny the agency." *Jacobs v. Yellow Cab Affiliation, Inc.*, 73 N.E.3d 1220, 1235 (Ill. App. Ct. 2017). An agent's apparent authority "may be presumed from silence of the alleged principals when they knowingly allow another to act for them as their agent." *Mateyka v. Schroeder*, 504 N.E.2d 1289, 1295 (Ill. App. Ct. 1987).

Plaintiff bears the burden to prove apparent authority by establishing that: (1) Defendant consented to or knowingly acquiesced in Trexler's exercise of authority; (2) Plaintiff reasonably concluded, based upon the actions of Defendant and Trexler, that Trexler was Defendant's agent; and (3) Plaintiff justifiably relied upon Trexler's apparent authority to its detriment. *Career Concepts, Inc. v. Synergy, Inc.*, 865 N.E.2d 385, 393 (Ill. App. Ct. 2007). Although the existence and scope of apparent authority is usually a question of fact, courts may summarily decide the issue where "the parties' relationship is clear" from the record. *Loncarevic & Assocs., Inc. v. Stanley Foam Corp.*, 72 N.E.3d 798, 807 (Ill. App. Ct. 2017).

Only the words or conduct of the principal, not the agent, establish an agent's authority. *Opp*, 231 F.3d at 1064; *Zahl v. Krupa*, 850 N.E.2d 304, 312 (Ill. App. Ct. 2006). Where, as here, a corporation is the alleged principal, "it only acts through persons—*e.g.*, its officers and directors." *Zahl*, 860 N.E.2d at 312.

### 3. Trexler's Apparent Authority Binds Defendant

The parties dispute whether Trexler had apparent authority to bind Defendant to the Supply Agreement. Specifically, Plaintiff argues that Trexler had authority to bind Defendant because, among other things, Trexler ran all aspects of Defendant's business with Plaintiff. [39] at 9. On the other hand, Defendant attempts to minimize Trexler's role, contending that he lacked any authority because he merely "managed the normal operations of purchasing products from [Plaintiff] and then selling them to ECI." [30] at 4.

Viewing the record, this Court finds that the evidence squarely supports Plaintiff's characterization. Trexler made all decisions relating to the parties' business on behalf of Defendant, including managing and directing product purchases and sales. [33] ¶¶ 13, 27. In contrast, Zurman, Defendant's sole director and officer, chose to have little involvement with Plaintiff; in fact, he admitted that he never had any contact with Plaintiff. *Id.* ¶¶ 4, 34. It comes as no surprise that, from Plaintiff's perspective, Trexler remained in charge of the parties' relationship, because: (1) Plaintiff at first believed that Trexler was Defendant's president; and (2) Plaintiff's only other contacts with Defendant were its warehouse staff and Trexler's assistant. [33-1] at 3; [33] ¶¶ 11, 14.

11

And, in August 2017, when Defendant fell behind on payments to Plaintiff, Zurman continued to stand by and permit Trexler to resolve the issue. When Trexler alerted Zurman to the arrears, Zurman chose not to handle the issue himself, and instead instructed Trexler to discuss a repayment plan with Plaintiff and promptly pay $200,000 to end the shipping hold. [31] ¶¶ 12–13. Zurman himself admitted that he "entrusted" the relationship with Plaintiff to Trexler, and therefore told Trexler to "fix" the payment issue. [33-5] at 21.

In short, consistent with his delegation of broad authority to Trexler to manage the parties' relationship, Zurman chose to silently stand by and permit Trexler to "fix" Defendant's payment arrears once Trexler so alerted him in August 2017. As a natural result of that delegation, Trexler entered into the Supply Agreement, which set forth a payment plan that—by all accounts—intended to "fix" the arrears. Illinois supports this Court's finding of apparent authority under these circumstances. *See, e.g.*, *Loncarevic*, 72 N.E.3d at 808 (affirming finding of apparent authority where the defendant's president gave its employee "broad authority" to do "what he thought was best," while he chose to "silently stand by and permit" the employee to perform his duties); *Lundberg v. Church Farm, Inc.*, 502 N.E.2d 806, 813 (Ill. App. Ct. 1986) (apparent authority existed where the corporation's owner placed its employee in a "managerial position giving him complete control of [the corporation] and its dealings with the public").

In finding that Trexler had apparent authority to bind Defendant to the Supply Agreement, this Court rejects Defendant's arguments to the contrary. Defendant

primarily argues that Plaintiff had an affirmative duty to confirm Trexler's authority to enter into the Supply Agreement. *See* [40] at 4–5. And, if Plaintiff had done that, so the argument goes, it would have discovered that Zurman had not authorized Trexler to enter into the Supply Agreement. *Id.*

But the sole case upon which Defendant relies is distinguishable. *See id.* (citing *Sphere Drake Ins. Ltd. v. All Am. Life Ins. Co.*, 300 F. Supp. 2d 606 (N.D. Ill. 2003)). In *Sphere Drake*, the district court held that, where a reinsurance intermediary possessed knowledge that a reinsurer's purported agent had a premium limit of $7 million, that knowledge triggered its duty to inquire as to the extent of the purported agent's authority when the agent attempted to exceed the premium limit in issuing retrocession. *Id.* at 618–19. The intermediary there, however, had *actual* knowledge that the reinsurer's purported agent did not have authority to exceed the premium limit. *Id.* Therefore, the intermediary had a duty to make a "reasonable inquiry to ensure that there is authority." *Id.* at 618.

Here, in contrast to *Sphere Drake*, the record is devoid of any evidence indicating that Plaintiff knew—or had any reason to know—that Trexler lacked the authority to bind Defendant to the Supply Agreement. To the contrary, because Zurman gave Trexler *carte blanche* to manage the parties' relationship, including Defendant's payment arrears, Plaintiff had no reason to question that Trexler possessed the authority to bind Defendant to the Supply Agreement.

Defendant also argues that Plaintiff cannot establish apparent authority because it cannot point to a single representation from Zurman to Plaintiff. [36] at

13

6. This Court similarly finds no merit to this argument because Illinois law does not require proof of an express representation; rather, apparent authority can arise where a principal "creates, by its words *or* conduct, the reasonable impression that the agent has the authority to perform a certain act on its behalf." *Weil*, 577 N.E.2d at 1350 (emphasis added). Here, Zurman created the reasonable impression—through its conduct in ceding all managerial control of the parties' relationship to Trexler—that Trexler had the authority to execute the Supply Agreement on Defendant's behalf.[1]

### 3. Defendant Breached The Supply Agreement

Because this Court finds as a matter of law that Trexler had authority to enter into the Supply Agreement, it next addresses whether that finding entitles Plaintiff to judgment on its breach of contract claim. To prevail on that claim, Plaintiff "must establish the existence of a valid and enforceable contract, plaintiff's performance, defendant's breach of the terms of the contract, and damages resulting from the breach." *Spitz*, 759 F.3d at 730 (quoting *Lindy Lu,* 984 N.E.2d at 1175).

This Court finds that Plaintiff meets its burden. For the reasons stated above, this Court rejects Defendant's position that the Supply Agreement is invalid. Further, Defendant fails to contest any other elements, and the undisputed facts confirm that Plaintiff has carried its burden of proving them: Plaintiff performed under the Supply Agreement by delivering products, [33] ¶ 44; Defendant breached

---

[1] The parties also dispute whether Trexler had actual authority to enter into the Supply Agreement. *See, e.g.*, [36] at 3–4; [39] at 4–7. Because this Court finds as a matter of law that Trexler had apparent authority, it need not reach the merits of the parties' arguments on this point.

14

the Supply Agreement by failing to make all but two payments, *id.* ¶ 42; [33-4] at 18; and Defendant's failure to pay financially damaged Plaintiff, [33] ¶ 50. This Court thus grants summary judgment to Plaintiff on its breach of contract claim.

### B. Count II: Unjust Enrichment

In Illinois, unjust enrichment is "based upon an implied contract; where there is a specific contract that governs the relationship of the parties, the doctrine has no application." *Blythe Holdings, Inc. v. DeAngelis*, 750 F.3d 653, 658 (7th Cir. 2014) (quoting *People ex rel. Hartigan v. E & E Hauling, Inc.,* 607 N.E.2d 165, 177 (Ill. 1992)).[2]

Because this Court finds that Plaintiff is entitled to summary judgment on its breach of contract action, it necessarily finds that Plaintiff's unjust enrichment claim—which, as Plaintiff concedes, is pled in the alternative, [34] at 14–16—has no application. This Court thus dismisses Plaintiff's unjust enrichment claim as moot.

## IV. Conclusion

For the reasons explained above, this Court grants Plaintiff's motion for summary judgment [32] and denies Defendant's motion for summary judgment [30].

Judgment will enter in Plaintiff's favor in the amount of $960,284.04, plus interest, calculated consistent with the Supply Agreement. The parties shall meet and confer and file a joint status report within 7 days of this order, providing the exact amount of interest to which Plaintiff is entitled under the Supply Agreement.

---

[2] The parties agree that Illinois law applies to Plaintiff's unjust enrichment claim. *See* [30] at 5–6; [34] at 14–16.

15

Plaintiff shall additionally comply with Local Rules 54.1 and 54.3 on its petitions for costs and fees. All other dates and deadlines are stricken. Civil case terminated.

Dated: December 10, 2018

Entered:

_____
John Robert Blakey
United States District Judge